| UNITED STATES DISTRICT COURT | C/M |
| EASTERN DISTRICT OF NEW YORK | |

----------------------------------------------------------X
VICKY WARE BEY,

                        Plaintiff,

          - against -

JOSEPH PONTE; AARON SCARLETT; NEW
YORK CITY DEPARTMENT OF
CORRECTIONS; CITY OF NEW YORK;
CYNTHIA BRANN; JOHN DOE 1-1000; and
JANE DOE 1-1000,

                        Defendants.
----------------------------------------------------------X

**MEMORANDUM
DECISION AND ORDER**

17-cv-3476 (BMC)(JO)

**COGAN**, District Judge.

      Plaintiff *pro se*, who describes herself as an "indigenous Moorish American" who resides in the "Wyandanch Territory" of the "New York Republic,"[1] was a Corrections Officer with the New York City Department of Correction ("DOC"). Her amended complaint purports to allege claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, the Racketeer Influenced and Corrupt Organizations Act, 42 U.S.C. § 1983, and various federal criminal law statutes. Plaintiff has served the City of New York, the DOC, Joseph Ponte (the former Commissioner of the DOC), and Cynthia Brann (the Acting Commissioner of the DOC). Aaron Scarlett, a former DOC Corrections Officer who is the source of plaintiff's complaint, and John and Jane Does 1-1000, who are individuals unknown to plaintiff that allegedly engaged in stalking her, remain unserved.[2] Plaintiff's amended complaint does not state a plausible claim and defendants' motion to dismiss is therefore granted.

---

[1] There is a hamlet called Wyandanch within the town of Babylon, Suffolk County.

[2] Plaintiff attempted to serve Scarlett at Rikers Island Correctional facility, but he was no longer employed by the DOC, so the service was invalid.

## SUMMARY OF COMPLAINT

Plaintiff began work as a corrections officer in 1998. Ten years later, a man with whom she formerly had a relationship, defendant Aaron Scarlett, was also hired as a corrections officer. He had committed some undescribed wrong against plaintiff in the past, and when he attempted to contact her after he was hired, she reminded him of this wrong. This made him angry and fearful that plaintiff was going to disclose his past conduct at work, and he began to spread sexual rumors about plaintiff at work (we are not told the substance of these rumors) which drew the attention of other male corrections officers to her.

Plaintiff was able to endure this conduct from 2009-2013 because plaintiff and Scarlett had different assignments, but in 2013, her schedule was changed so that she saw him on the employee bus on a daily basis. Scarlett then intensified his rumor spreading which caused other employers to "treat her disparately" and to "harass her," although we are not told what they did besides look at her. The only other details that plaintiff gives as to Scarlett's intensified behavior is that he would point plaintiff out to other employees on the bus when he boarded, commenting on where she was sitting on the bus. For example, plaintiff alleges that he would yell to others, "[l]ook she's in the middle."

Although there are no allegations that plaintiff first informed her supervisor or human resources of this behavior, plaintiff alleges that on December 12, 2014, she complained about this "sexual harassment" directly to defendant Commissioner Ponte. Immediately after she complained, defendants, including Commissioner Ponte, began a campaign that she calls "Organized Stalking," in retaliation against her. Plaintiff recounts a number of specific incidents in which unknown individuals would park in front of her house or drive around her house in a circle or follow her when she drove to or from work. On one occasion, she found footprints in

2

the snow in front of garage going around to the back of her house. On another occasion, she found one of her tires slashed in the employee parking lot at Rikers Island. On a different day, someone followed her to the Post Office and gave the clerk a piece of paper, but the clerk did not give the person anything back.

On another occasion in the end of December of 2014, a civilian employee of DOC was riding the employee bus and began laughing and zipping and unzipping his pants zipper. Another time, the bus driver called over his radio, "the package is on the bus" when plaintiff got on the bus, which she alleges referred to her because Scarlett boarded the bus at the next stop and sat in "close proximity" to her. When they both got off the bus at the parking lot of the main control building and entered their vehicles, Scarlett attempted to follow plaintiff home until she took an evasive maneuver and lost him. Plaintiff complained to the warden of the facility where she was assigned and informed him of the incident, but nothing was done.

Plaintiff also recounts another time where the bus driver called over his radio "ETA 22 seconds" which she contends was alerting someone that she was arriving. In addition, there was one occasion where a vehicle was parked in front of her home, watching her, and she saw Scarlett, who had been walking towards her house, run to get into that vehicle. Plaintiff did not observe Scarlett in most of the stalking incidents, but plaintiff alleges that the unknown people stalking her were allied with him and defendant Ponte and were recruited to retaliate against her.

In April 2015, plaintiff complained to her Union President about the alleged stalking events, although she does not tell us what came of that, if anything. However, when she was returning home from her meeting with the Union President, there was a man standing in the street showing a parked motorist a "false accusatory instrument" (it is not defined further) with her picture on it, but she continued to drive past. Then, in May 2015, plaintiff complained to the

3

New York City Human Rights Commission, but nothing was done. On the same day, she also informed the Equal Employment Office within the DOC that she was being stalked and retaliated against, but we are not told what transpired, if anything, from that complaint.

Plaintiff's amended complaint then sets forth a description of what she refers to as the "Counter Intelligence Program known as Cointelpro," which she believes the defendants were mimicking. She says this program has "detailed phases" which "operate[] in sequential order." She does not explain the basis for her knowledge about this program, and there may not be one; rather, she says her knowledge is "based upon plaintiff's personal encounters," apparently in this case. She describes in detail each step of this program, and each step has a title: "Initial Covert Stalking;" "Character Assassination . . . through slander and defamation"; "Recruitment"; "Stalking increases and becomes more organized"; "Sensitization and Street Theatre"; "Invasion"; "Electronic and Video Surveillance Abuse"; "Ghosting"; "Victim is discredited"; and "Sabotage." The description of the steps of the program ends with allegations that the threats against her are continuing, that she fears for her life, and that her family and a friend, who remains unnamed, have also been threatened and harassed, albeit she does not provide any description of the alleged conduct to which they have been subjected.

The narrative in the amended complaint then resumes in November 2015, when plaintiff allegedly had another meeting with Commissioner Ponte about these events, but we are given no specifics as to what transpired in that meeting. In December 2015, she submitted an "Unusual Incident Report" describing the ongoing Organized Stalking campaign.

In response to her complaint, plaintiff was ordered to report to the DOC Health Management Division, which placed her on medical leave "for psychological reasons," and she was relieved of her weapon. Her leave continues pending her submission of medical evidence

showing that she was psychologically able to work, which plaintiff believes constitutes a constructive termination. Plaintiff claims that defendants placed her on medical leave in an effort to "discredit her [and] to hide the crimes being committed against her and some of her family members."

The amended complaint continues with plaintiff's eight claims for relief. There are some additional factual allegations contained within these claims, including the allegation that defendants broke into her house and "installed covert cameras in the bedrooms, bathrooms and other areas of her home"; that defendants were aware that she has an unspecified physical disability (her EEOC complaint identifies it as a back and knee injury) and put her on leave to deprive her of a disability pension; and that defendants had intercepted and published not only her private emails and texts but those of her family and friend. These publications also included nude photographs of the private body parts, which she identifies in detail, of her, her family, and her friend, which she refers to as "video voyeurism." She also alleges that other unidentified law enforcement and city agencies are allied and participating against her as part of Organized Stalking. Finally, she questions which corporations are providing money to the CEOs of city agencies to carry out the campaign of Organized Stalking.

## DISCUSSION

Defendants have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Under Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), a plaintiff must provide the grounds upon which her claim rests through factual allegations sufficient to raise a right to relief above the speculative level. A complaint must allege "'enough facts to state a claim to relief that is

5

plausible on its face.'" Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570)); see also Iqbal, 556 U.S. at 678 (same).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. In applying that standard, the court accepts as true all well-pleaded factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id. If the court can infer no more than "the mere possibility of misconduct" from the factual averments, id. at 679, or if, in other words, the well-pleaded allegations of the complaint have not "nudged [the plaintiff's] claims across the line from conceivable to plausible," dismissal is appropriate. Twombly, 550 U.S. at 570. The "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . . " Id. at 555; see also Brown v. Daikin Am., Inc., 756 F.3d 219, 228 n.10 (2d Cir. 2014).

In applying these rules, the Court is mindful that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks omitted). Nevertheless, a *pro se* complaint that is delusional is, by definition, not plausible. As the Second Circuit recognized in Gallop v. Cheney, 642 F.3d 364, 368 (2d Cir. 2011), a court may dismiss a complaint as factually frivolous "if the sufficiently well-pleaded facts are 'clearly baseless – that is, they are 'fanciful,' 'fantastic,' or 'delusional.'" (quoting Denton v. Hernandez, 504 U.S. 25, 32-33 (1992)).

Although there may be one or two nuggets of actual fact in plaintiff's complaint – for example, she probably did have a relationship with Scarlett and perhaps something went wrong with him at the jobsite – most of the allegations are the standard fare of pure paranoia – people

6

are out to get me, and so anyone walking or driving my way or near my house that I don't know must be following me with ill intent. These allegations must be discounted under Ashcroft and Twombly, yet they so permeate plaintiff's complaint that they render the claims utterly implausible. The facts are that plaintiff is not a victim of Cointelpro; Commissioner Ponte did not direct a break-in of her house, the surreptitious videotaping of her and her family's private body parts, or the publication of those pictures; an unknown person giving a paper (probably an envelope) to a postal clerk and not getting anything back does not mean that the conspiracy against plaintiff has reached into the Postal Service; the bus driver at Rikers Island did not alert the Transportation Department that plaintiff had boarded the employee bus so that Scarlett and other unidentified coconspirators could follow plaintiff; and if there was a high-speed car chase, it was not at the behest of the DOC. There is a limit to how far a court can apply the rule that a plaintiff's allegations should be deemed true, and obvious figments of imagination go beyond that limit.

What may well have actually happened is that when plaintiff gave the Health Management Division her conspiracy theory that the DOC was involved in an organized stalking of her, it understandably sent her for a psychiatric evaluation and recommended putting her on leave until she could get a medical certification that she was able to work. Based on plaintiff's allegations, I do not see how anyone could find fault with that, nor do I see anything else that the Health Management Division could have reasonably done. No employer could trust an employee with this kind of thinking to perform without incident in the workplace – especially a workplace like the Department of Correction. Thus, referring plaintiff for an evaluation provides no indication of gender or disability discrimination.

I suppose that in a universe of unlimited possibilities, it is not impossible that plaintiff really is the victim of Organized Stalking, as she describes it. But remotely possible is not enough to state a claim under Twombly and Iqbal. The conspiracy that plaintiff has alleged is so far-out, fanciful, and delusional that there is no plausible claim stated. Accordingly, the amended complaint is dismissed for failure to state a claim.

Moreover, there are alternative bases for dismissing both the DOC and the City of New York. First, New York City agencies, such as the DOC, are not suable entities. See N.Y.C. Admin. Code & Charter Ch. 16 § 396; Cuadrado v. New York City Dep't of Corr., No. 08 Civ. 3026, 2009 WL 1033268, at *2 (S.D.N.Y. April 16, 2009). Second, a municipality, such as the City of New York, can be liable under § 1983 only if the plaintiff can show that a municipal policy or custom caused the deprivation of his or her constitutional rights. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978). Although former Commissioner Ponte's orchestration of a campaign of Organized Stalking could give rise to a Monell claim, once that conclusory and delusional allegation is stripped out of the complaint, there are no allegations to support municipal liability.

## CONCLUSION

Defendants' motion to dismiss is granted. The unserved defendants are dismissed and any remaining open motions are denied as moot. The Clerk of Court is directed to terminate the unserved defendants and enter judgment in favor of those who have been served. The Court

certifies pursuant to 28 U.S.C. § 19l5(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal.  See  Coppedge v. United States, 369 U.S. 438 (1962).

**SO ORDERED.**

                                                                                                U.S.D.J.

Dated: Brooklyn, New York
       September 13, 2017